IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 5:24CR77 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET M. BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| TERRANCE RUCKER, | ) | GOVERNMENT'S TRIAL BRIEF |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its counsel, Carol M. Skutnik, Acting United States Attorney, and Segev Phillips and Kristen Rolph, Assistant United States Attorneys, hereby submits the following trial brief.

## I.  STATEMENT OF FACTS

### A.  Package containing methamphetamine and fentanyl

On November 3, 2023, Javay Cox shipped a parcel containing methamphetamine and fentanyl to Terrance Rucker using David Collins's residence as the shipping address. As regular practice, the United States Postal Inspector Service investigates suspicious parcel for the possible presence of controlled substances. USPIS identified a suspicious parcel addressed to David Collins, **** Haggarty Way, Cuyahoga Falls, OH 44223, with a return address of Chanel Cox, **** E. Desert Flower Ln., Phoenix, AZ 85044 (hereinafter "the Subject Parcel").

Agents made inquiries with CLEAR, concerning the delivery address were able to associate an individual with the name David R. Collins. Agents also made inquiries with CLEAR concerning the return address of 3642 E. Desert Flower Ln., Phoenix, AZ 85044, and were able to associate an individual with the name Chanel Cox at the listed return address. According to CLEAR, Chanel Cox, and her spouse, Javay Cox, are associated with the return address and are

also formerly associated with addresses in Akron, Ohio. Phone number 602-767-9067 was listed as the sender's phone number on the Priority Mail Express label on the parcel. Records revealed that Javay Cox in Phoenix, Arizona is the subscriber for phone number 602-767-9067. Agents reviewed United States Postal Service (USPS) business records and learned that on November 3, 2023, phone number 602-767-9067, subscribed to receive SMS text messages updates from USPS for the delivery status of the parcel. Agents reviewed USPS business records and identified that, on November 3, 2023, Cox used phone number 602-767-9067 to call USPS customer service regarding the status of the parcel. Cox dropped this phone number on November 7, 2023, the day after the controlled delivery in this case.

On November 3, 2023, the case agent intercepted the parcel once it arrived in Cleveland. After a canine "dog sniff" lineup was conducted, the canine positively indicated the presence of controlled substances in the parcel. A federal search warrant was obtained. The outer box of the parcel was a brown ready post box. Agents opened the parcel pursuant to the search warrant and discovered what laboratory tests demonstrated was 4,451 grams of methamphetamine inside approximately ten individual clear zip lock bags. The zip lock bags were packaged inside clear vacuum sealed food saver bags that were wrapped in black duct tape and concealed in clothes.

Additionally, the parcel contained approximately 1,104 grams of pills containing fentanyl, 4-ANPP, and Fluorofentanyl. They were coded to be Oxycodone 30mg tablets - blueish round tablets marked as "M" on one side and "30" on the other side. These were packaged inside clear vacuum sealed food saver bags which was concealed inside a black bag that was inside a white USPS priority mail box.

The drugs were removed from the package and replaced with "sham" drugs which were then repackaged inside the parcel. Electronic monitors were also placed inside the parcel that

would track the parcel via GPS as well as alert if the box was opened. Investigators arranged to deliver this package in a coordinated law enforcement effort.

B.  Controlled delivery

A Postal Inspector acting as an undercover USPS delivery employee, delivered the parcel to the front porch of 3425 Haggarty Way, Cuyahoga Falls, OH 44223. Moments later, David Collins retrieved the parcel from the front porch and brought it inside the delivery address.

At approximately 2:30 p.m., the electronic monitoring equipment inside the parcel indicated it had moved toward David Collins's garage. At approximately 3:00 p.m., a 2016 black Honda Pilot bearing Ohio license plate 306ZPV backed into David Collins's driveway all the way to the garage. Investigators observed the driver of the Honda, subsequently identified as Terrance Rucker, exit the Honda while communicating on a cellular phone. Investigators observed a front passenger in the Honda, subsequently identified as a 16-year-old juvenile female. Shortly after Rucker arrived, the garage door opened. Investigators observed Rucker and Collins standing in the garage. The garage door was then shut.  Shortly thereafter, agents received alerts from the electronic monitoring equipment inside the Subject Parcel that it was moving and was opened.

Investigators executed the search warrant.  As they approached the residence, the garage door began opening. A drone camera shows that, as the door is opening, Rucker is moving a plastic bin.  As officers approached Rucker, he raised his hands and stepped in front of the plastic bin.  That plastic bin contained all of the contents that had been in the delivered box, including the sham drugs.  The bin also contained a tool to detect surveillance equipment.

Investigators saw the parcel, consisting of the white USPS inner box inside the outer brown ready post box, laying on the garage floor. It was evident that both boxes had been opened. The brown ready post box was opened from one of the sides, which from the agent's

experience, is not how someone would typically open a box. This appeared to be done to circumvent detection. Based on his experience the case agent knows some individuals who receive controlled substances via the U.S. Mail know that investigators place electronic monitoring equipment in the boxes during controlled delivery operations. Those individuals believe that if they open the box from the side, they may circumvent triggering the electronic monitoring equipment and thwart law enforcement detection. Additionally, the delivery address that was handwritten on the inner white USPS box was cut out from the box, which is consistent with the practice that individuals who use the U.S. Mail to receive controlled substances frequently remove the name and address in the event law enforcement later recovers the box.

Investigators found the following on his person: a Taurus revolver in his pant pocket, three cellular phones (one Motorola and two Apple iPhones), a pocketknife/box cutter, and an Ohio Driver's License in Rucker's name. Meanwhile, Collins exited the home through a back door onto the deck. Collins complied with verbal instructions to come down the deck stairs and was detained without incident in the backyard of the residence. A Google Pixel cellular phone was found on Collins.

At approximately 4:06 p.m., while Rucker was in custody, investigators observed that the Black Apple iPhone found on his person was receiving an incoming call from the contact "Javay." At approximately 4:08 p.m., investigators observed that the lock screen of the Rucker's iPhone indicated a text message from the contact "Javay." The content of the message was not observable. At approximately 4:08 p.m., while in custody, the lock screen of Rucker's Green iPhone indicated Rucker received a text message from the contact "Javay." The content of the message was not observable.

C. Search of Rucker's vehicle

During a search of Rucker's Honda Pilot, agents found a black backpack containing a baggie of 28.34 grams of a substance containing fentanyl and 4-ANPP.

D. Collins's Phone

Collins used his Google Pixel cellular phone to communicate with Rucker. Rucker's phone number was saved as the contact "Felix the Cat" in Collins's Google Pixel cellular phone. Collins willingly provided written consent allowing investigators to search his Google Pixel cellular phone. Collins had intentionally deleted a lot of communications he had with Rucker. Agents reviewed communications in Collins's Google Pixel cellular phone and identified a call and a text message between Collins and Rucker. On November 6, 2023, at 3:02 p.m., Rucker sent Collins a text stating, "I'm here." At 3:04 p.m., Rucker called Collins. The timing of the text message and call are around the time when investigators observed Rucker arrive at Collins's residence in the Honda Pilot and just before the garage door was opened. Agents called phone number 330-802-6894 with a government issued cell phone while on scene and simultaneously the Motorola cellular phone that was seized from Rucker indicated an incoming call from a restricted number – confirming the Motorola cellular phone recovered from Rucker's person was the phone Rucker used to communicate with Collins.

E. Cellular phone search warrant

On November 14, 2023, Magistrate Judge Knapp authorized a search warrant for the three cellular phones seized from Rucker. The extraction report from the Motorola cellular phone (phone number 330-802-6894) contained the following evidence:

- From November 3, 2023, through November 6, 2023, Rucker exchanged approximately 17 calls with Collins (phone number 330-819-3547).

- On November 6, 2023, the following text messages were sent:

| Time | From | To | Content |
| --- | --- | --- | --- |
| 1:31 PM | Collins | Rucker | I got that HVAC part…would it be alright if I got like 40 hardware a 40 other for parts if needed |
| 1:41 PM | Collins | Rucker | Call me |
| 1:43 PM | Britt Dolche | Rucker | Yooo what's up? |
| 1:45 PM | Britt Dolche | Rucker | You want these little couple bucks or naw. |
| 3:02 PM | Rucker | Collins | I'm here |
| 3:02 PM | Rucker | Britt Dolche | Yeah man. I'm coming |
| 3:03 PM | Britt Dolche | Rucker | I'm gone now |
| 3:05 PM | Britt Dolche | Rucker | All I need is a a half off that and 5 of them lil daddies |

On April 8, 2025, a cellular extraction report was completed on Rucker's iPhone 14 and iPhone 13.  These extractions were able to be completed due to an update to the extraction software.  These phones contained significant evidence of drug trafficking, including text messages with Javay Cox where, among other things, Rucker give Collins's name and address to Cox (for mailing packages) and Cox sends the receipt for the Subject Parcel to Collins.  Collins later tracked the subject parcel on November 4 and 6 from his home, as demonstrated by comparing USPS tracking records and records for particular IP addresses from Charter Communications.

Also in Rucker's iPhones is incriminating evidence of him communicating with his brother and the juvenile female that was in the vehicle.  Included in the communications were those made after Rucker was in custody.  Though his phone was seized, Rucker still had his Apple watch and so exchanged text messages acknowledging what happened.  These were copied onto his iPhone.

Also in his phones is significant evidence of Rucker communicating with buyers of his drugs.

The government is still going through the phones and providing Rucker with notice of the items it is intending to use. Rucker should be aware of the contents of his phones.

F. **RUCKER JAIL CALLS**

Rucker was incarnated at NEOCC from November 8, 2023, through November 16, 2023, and made 22 calls from NEOCC. The first call Rucker made was to the juvenile female with Rucker when he drove to the Delivery Address. Rucker asked, "What was the house looking like? Was it cool?" The juvenile replied, "Your brother cleared it out." Rucker stated, "Ok. Good. Good. Good. I was wondering about that." Rucker stated, "Man, I should have listened. My bad. I'm sorry. You were right. I'm going listen to you from now on." Rucker stated, "Did you get your money out of the safe?" The juvenile replied, "He put it all up. I opened it, but he put it up." Rucker stated, "That's what's up. That's what's up." Rucker stated, "When you go there today, look next to the bed and get that purple bag." The juvenile replied, "Ok."

The juvenile said she reported his phones as lost. Rucker replied, "Good. Good shit. Good shit. Mark them as lost and that way they can't fuck with my shit. Fuckers…They took all three of my phones." Rucker then stated, "When that garage door opened, I swear it was just like a movie."

On November 8, 2023, at 5:57 p.m., Rucker called the juvenile. She stated, "I want to go to the house, but I ain't gonna do that because I don't know. But we cleaned up in there." Rucker replied, "Did you get that earlier?" She stated, "Yup. Yup." Agents believe Rucker is referring to the purple bag next to the bed he previously asked her to retrieve.

II. **CONTROLLING LAW**

*Count 1: Conspiracy to Possess with Intent to Distribute Controlled Substances*

Count 1 of the indictment charges the defendant with Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 846. To sustain its burden of proof for this crime, the United States must prove all of the following elements beyond a reasonable doubt:

1. First, that two or more persons conspired, or agreed, to Possess with Intent to Distribute Controlled Substances.

2. Second, that the defendant(s) knew of the conspiracy and its [objects] [aims] [goals],

3. Third, that the defendant joined the conspiracy with the intent that at least one of conspirators engage in conduct that satisfies the elements of Possess with Intent to Distribute Controlled Substances.

Proof of conspiracy does not require proof that a defendant knew everything about the conspiracy, or everyone else involved, or that he was a member of it from the very beginning. Nor does it require proof that a defendant played a major role in the conspiracy, or that his connection to it was substantial. A slight role or connection may be enough.

Further, this does not require proof that the defendant knew the drugs involved were methamphetamine and a mixture or substance containing fentanyl. It is enough that the defendant knew that it was some kind of controlled substance. Nor does this require proof that the defendant knew how much methamphetamine and a mixture or substance containing fentanyl was involved. It is enough that the defendant knew that some quantity was involved. A defendant's knowledge can be proved indirectly by facts and circumstances which lead to a conclusion that he knew of the conspiracy and its objects, aims, or goals.

Authority:

Sixth Circuit Pattern Criminal Jury Instructions, 2023 Edition, Section 14.05.

*Counts 2 and 4: Attempted Possession with Intent to Distribute Methamphetamine*

Count 2 of the indictment accuses the defendant of attempting to commit the crime of possession of methamphetamine with intent to distribute. Count 4 charges the same but for fentanyl.  To sustain its burden of proof, the government must prove the following elements beyond a reasonable doubt:

1. First, that the defendant intended to commit the crime of possession of methamphetamine [or fentanyl] with intent to distribute.
2. Second, that the defendant did some overt act that was a substantial step towards committing the crime of attempted possession of methamphetamine [or fentanyl] with intent to distribute.

Merely preparing to commit a crime is not a substantial step. The defendant's conduct must go beyond mere preparation, and must strongly confirm that he intended to attempt to possess methamphetamine with intent to distribute. But the government does not have to prove that the defendant did everything except the last act necessary to complete the crime. A substantial step beyond mere preparation is enough.

<u>Authority</u>:

Sixth Circuit Pattern Criminal Jury Instructions, 2023 Edition, Section 5.01.

*Count 6: Possession with Intent to Distribute Fentanyl*

In Count 6, the defendant is charged with the crime of possession of fentanyl with intent to distribute. The government must prove the following elements beyond a reasonable doubt:

1. First, the defendant knowingly [or intentionally] possessed Fentanyl.
2. Second, the defendant intended to distribute Fentanyl.

To prove that the defendant "knowingly" possessed the fentanyl, the defendant did not have to know that the substance was fentanyl. It is enough that the defendant knew that it was some kind of controlled substance. Further, the defendant did not have to know how much fentanyl he possessed. It is enough that the defendant knew that he possessed some quantity of fentanyl.

The phrase "intended to distribute" means the defendant intended to deliver or transfer a controlled substance sometime in the future. The term distribute includes the actual, constructive, or attempted transfer of a controlled substance. To distribute a controlled substance, there need not be an exchange of money.

Authority:

Sixth Circuit Pattern Criminal Jury Instructions, 2023 Edition, Section 14.01.

### III. STIPULATIONS

The parties have not agreed on any stipulations. The government will continue to attempt to engage defendant to streamline trial.

### IV. POTENTIAL EVIDENTIARY ISSUES

A. DEFENDANT'S STATEMENTS ARE SUBSTANTIVELY ADMISSIBLE UNDER RULE 801(d)(2) ONLY WHEN OFFERED BY THE GOVERNMENT.

The Government intends to admit some of Defendant's out-of-court statements for the truth of the matters asserted. Out-of-court statements made by a party-opponent are excluded from the definition of hearsay under Rule 801(d)(2), but this exception does not apply when the same statements are offered by the party himself. The party-opponent exception reflects the fact that the adversarial process allows the party-declarant to rebut his or her own admissions by testifying at trial. *See United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005). This exception does not, however, extend to a party's attempt to introduce his or her own statements

through the testimony of other witnesses.  *See United States v. Payne*, 437 F.3d 540, 547-48 (6th Cir. 2006).  Precluding a defendant from eliciting inadmissible hearsay statements does not violate the Confrontation Clause.  *See United States v. Ford*, 761 F.3d 641 (6th Cir. 2014).

Therefore, the Government respectfully requests that the Court prohibit Defendant from introducing any of his out-of-court statements at trial.

B. USE OF "INEXTRICABLY INTERTWINED" OR OTHERWISE ESSENTIAL *RES GESTAE* EVIDENCE OR, IN THE ALTERNATIVE, NOTICE UNDER FEDERAL RULE OF EVIDENCE 404(B)

The United States previously provided notice to the Court and defendant of its intention to introduce evidence of prior packages and jail calls at trial.  (R. 85: Notice[1]).  The argument in that filing is adopted herein.  Moreover, the government intends to introduce evidence from the recently extracted iPhones.  Specifically, the government intends to introduce communications between defendant and customers looking for drugs that were close in time to the charged conspiracy.  These are inextricably intertwined with the offense and, even if not, are being offered to demonstrate defendant's intent (to distribute drugs) and lack of mistake.  The legal standards set forth in the government's notice apply with equal force to these communications.

C. ADMISSIBILITY OF RECORDINGS AND TRANSCRIPTS

The United States will introduce video and audio recordings, specifically Rucker's jail calls and drone surveillance footage.  A synched transcript may be offered as a jury aid to be used while the video or audio recording is being played.  The government may also seek to admit the transcripts as exhibits for the jury.[2]  The Sixth Circuit reviewed the standards for admission

---

[1] The undersigned recognized that the Court's order requires PageID.  The stamped document available to the undersigned does not contain PageIDs but, instead, says "<PageID>".

[2]   Even absent a stipulation by the parties, the Sixth Circuit has repeatedly affirmed the validity of this procedure, so long as there is a preliminary foundation as to the preparation and

of "composite" tape recordings and transcripts in the cases *United States v. Scarborough*, 43 F.3d 1021, 1024 (6th Cir. 1994) and *United States v. Segines*, 17 F.3d 847, 854 (6th Cir. 1994).[3] As noted in *Scarborough* at 1024:

> "It is well settled that the admission of tape recordings at trial rests within the sound discretion of the trial court." *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir. 1983). In order to be admissible the district court must determine whether the tapes are "audible and sufficiently comprehensible for the jury to consider the contents." *Robinson*, 707 F.2d at 876. The district court abuses his discretion only "where the unintelligible portions of a tape recording are so substantial that the recording as a whole is rendered untrustworthy." *United States v. Scaife*, 749 F.2d 338, 345 (6th Cir. 1984).

The admission of audio and video recordings in evidence is subject to the rules of evidence generally. Accordingly, a proper foundation must be laid for their admission, and the recordings must be relevant and not privileged. Where practical, the original recordings should be used, pursuant to Fed. Rule 1002, and when telephone conversations are involved, evidence should be offered as to the correct telephone number, Rule 901(b)(6). *United States v. Watson*, 594 F.2d 1330, 1335 (10th Cir.), *cert. denied, Brown v. United States*, 444 U.S. 840 (1979). However, under Fed. Rule 1003, a duplicate is admissible to the same extent as an original unless there is a genuine question about the authenticity of the original or it would be unfair to

---

accuracy of the transcripts. *United States v. West*, 948 F.2d 1042, 1044 (6th Cir. 1991). This is so, especially when accompanied by a cautionary instruction that the recording, and not the transcript, is the evidence to be considered by the jury. See Pattern Criminal Jury Instructions, U.S. Sixth Circuit District Judges Association (2019), Section 7.17. In the instant case, a reviewing agent has compared the transcripts with the recorded conversations and will testify that the transcripts are a fair and accurate transcription of the various conversations.

[3] A "composite" recording is one in which only relevant portions of a conversation are presented with the non-pertinent portions of the conversation being removed. The government may admit only excerpts of some recordings, but will make clear when the recordings have been excerpted.

admit the duplicate.  The Sixth Circuit has discussed what necessary foundation for a tape recording is:

> While we have not in our prior cases indicated precisely what foundation is necessary to admit audiotapes where the challenge is to their admission generally, other circuits have alternately held that the district court must be satisfied that the recording is accurate, authentic, and generally trustworthy, that simply required is proof that the tape recording accurately reflects the conversation in question, or that a proper foundation may be established in two ways: a chain of custody… or alternatively, other testimony could be used to establish the accuracy and trustworthiness of the evidence.

*United States v. DeJohn*, 368 F.3d 533, 542 (6th Cir. 2004) (citations and quotation marks omitted).

  D. <u>EXPERT WITNESS TESTIMONY</u>

The government previously provided defense counsel with a notice of its intent to offer expert testimony from the following individuals.  The information pertaining to their testimony was also provided in discovery.

1. Chelsea Lang, Forensic Scientist, of the Cuyahoga County Regional Forensic Sciences Laboratory conducted the chemical analysis of suspected controlled substances seized in this case.  Ms. Lang's report, which included her qualifications, was previously disclosed in discovery.  The United States further filed notice pursuant to Federal Rule of Evidence 702 and disclosures required by Federal Rule 16(a)(1)(G).

2. Lynsey Mickolas, Forensic Chemist, with the United States Postal Inspection Service Forensic Laboratory Services, conducted the chemical analysis of suspected controlled substances seized in this case.  Ms. Mickolas' report and her qualifications were previously disclosed in discovery.  The United States further filed notice pursuant to Federal Rule of Evidence 702 and disclosures required by Federal Rule 16(a)(1)(G).

3. Kayti Wildman, Latent Print Analyst, with the United States Postal Inspection Service Forensic Laboratory Services, conducted the latent print analysis on the evidence seized in this case. Ms. Wildman's report and her qualifications was previously disclosed in discovery.  The United States further filed notice pursuant to Federal Rule of Evidence 702 and disclosures required by Federal Rule 16(a)(1)(G).

4. DEA Special Agent Shaun Moses will testify as an expert in the field of drug trafficking. Specifically, he will testify regarding narcotics trafficking, distribution amounts, street values, tools of the trade, including common methods and behavior of drug dealers and users, drug jargon, and the use of firearms and electronic devices in drug trafficking. A summary of SA Moses' qualifications and conclusions were contained in the complaint affidavit which was made available in discovery or on the ECF docket.  The United States filed a notice pursuant to Federal Rule of Evidence 702 and disclosures required by Federal Rule 16(a)(1)(G) outlining his qualifications and expected testimony.

E.     THE JURY SHOULD NOT BE INFORMED OF THE CONSEQUENCES OF ITS VERDICT OR OF CLAIMS REGARDING THE DEFENDANT'S TRUST.

If convicted in this case, Defendant faces a lengthy, mandatory term of imprisonment. Defendant may endeavor to educate the jury on the potential ramifications of a guilty verdict in this case with the hope of obtaining jury nullification.  The Sixth Circuit has firmly rejected such a strategy: "[U]nless juries have roles in sentencing, such as in capital sentencing proceedings, juries should be instructed not to consider defendants' possible sentences during deliberation." *United States v. Chesney*, 86 F.3d 564, 574 (6th Cir. 1996).  *See also United States v. Stotts*, 176 F.3d 880, 886 (6th Cir. 1999) ("the Supreme Court has held that juries should be instructed not to consider a defendant's possible sentence unless the jury has a specific role in sentencing"). The Supreme Court explained the reasoning behind insulating the jury from possible penalties in a case.

> The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict. Information regarding the consequences of a verdict is therefore irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion.

*Shannon v. United States*, 512 U.S. 573, 579 (1994). Accordingly, Defendant should not be permitted to distract and confuse the jury by inviting the jury to decide the issue of guilt with the knowledge of his potential sentencing exposure.

Defendants often infuse sentencing into the trial under the guise of cross-examining a cooperating witness. For example, a defendant may ask the witness about the maximum penalty for the charged offense, may compare a cooperator's plea agreement to the defendant's status, or use the cooperator to contrast a defendant's perceived situation, i.e., "You pleaded guilty because you didn't want a trial to bankrupt you, cause family strain, etc."

The United States moves this Court, *in limine*, to prohibit Defendant from eliciting any testimony or making any argument that may directly or indirectly inform the jury of sentencing options or endeavor to engender sympathy for Defendant. In so moving, the Government is asking the Court to direct counsel to conduct such examination so as to truly question about bias and not merely inform the jury of the potential sentences Defendant faces.

Similarly, in multiple pretrial filings, Defendant has made claims regarding a trust in his name, trademark law, admiralty law, and other claims relating to concepts in civil law. None of those have any relevance to the criminal matter at hand and therefore fail under Criminal Rule 401. Any attempt to raise these claims serve no purpose other than to confuse the jury in the hopes of jury nullification. This Court should prohibit them.

V.      **GOVERNMENT REPRESENTATIVE AND SEPARATION OF WITNESSES**

The United States respectfully requests that this Court issue a separation-of-witness order pursuant to Federal Rule of Evidence 615 and designates USPIS Special Agent Marc Kudley as its representative in this case to be present at counsel table throughout the trial. His presence in the courtroom during trial is essential to the presentation of the United States' case. *See* FED. R. EVID. 615(b) (specifically excluding from a sequestration order "an officer or employee of a

party that is not a natural person, after being designated as the party's representative by its attorney"); FED. R. EVID. 615(c) (providing an additional exception for essential witnesses).

## VI. CONCLUSION

The United States is ready and willing to confer with the defendant on all issues. For any issues on which disputes remain and arise at trial, for the foregoing reasons, the United States requests that the Court rule in accordance with the above points and authorities.

Respectfully submitted,

Carol M. Skutnik
United States Attorney

By: /s/ Kristen Rolph
Kristen Rolph  (MI: P75375)
Segev Phillips (OH: 0090144)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3735
(216) 522-8355 (facsimile)
Kristen.Rolph@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this April 15, 2025, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties through this Court's electronic filing system.  A copy will also be emailed to the Defendant at Terrancerucker@gmail.com  Parties may access this filing through the Court's system.

/s/ Segev Phillips
Segev Phillips
Assistant United States Attorney