IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 5:24-CR-77 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| TERRANCE RUCKER, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

The United States of America, by and through its counsel, David M. Toepfer, United States Attorney, and Stephanie Wojtasik, Assistant United States Attorney, respectfully submits this memorandum setting forth the United States's position regarding Defendant Terrance Rucker's sentencing. For the reasons explained below, and those to be advanced at the sentencing hearing, the United States submits that a significant sentence of imprisonment is appropriate.

**I.    Factual background.**

To support its sentencing position, the United States offers the following summary of the facts. The PSR also includes a description of Rucker's offense conduct.

   A.    <u>Rucker paid Javay Cox to mail ten pounds of methamphetamine and 7,000 fentanyl pills from Arizona to Ohio.</u>

Rucker and Javay Cox hatched a plan for Cox to send Rucker illegal drugs via USPS from Arizona to Ohio. Cox mailed the package on November 2, 2023, from Phoenix, Arizona, to David Collins in Cuyahoga Falls, Ohio. Unbeknownst to the defendants, USPIS intercepted the parcel the next day. Inside, they found approximately 7,000 fake Oxycodone pills: bluish round tablets marked with "M30" like Oxycodone. Laboratory tests later confirmed the pills actually contained a mixture of 4-ANPP, fentanyl, and fluorofentanyl, weighing approximately

1,104.68 grams (about two-and-a-half pounds or one kilogram). They also found bags containing an off-white crystalline substance, which laboratory tests later confirmed to be approximately 4,451.51 grams (about 10 pounds) of pure methamphetamine.

Those drugs could have led to significant profit for Rucker. Drug Enforcement Administration Special Agent Sean Moses testified at trial about how much those drugs would sell for on the street. He explained that the methamphetamine would cost approximately $1,200 to $1,500 per pound, meaning the meth itself was worth approximately $15,000. And the 7,000 fentanyl pills would have sold for at least $5 each, making them worth approximately $35,000. Rucker therefore hoped to receive about $50,000 worth of illegal drugs from Cox.

USPIS substituted the meth and fentanyl for decoy drugs and inserted a GPS tracking device into the box. Agents then began planning for a controlled delivery of the package.

All the while, Rucker thought the package would be delivered on November 4. That day, he visited Collins and compensated him for agreeing to receive the package. Rather than giving him money, though, Rucker provided Collins—a drug addict—approximately $80 worth of personal use fentanyl.

USPIS conducted the controlled delivery two days later. Collins collected the package once it arrived and moved it inside his house. The package's GPS tracker placed it just inside the house by the front door. A few hours later, Rucker called Collins to tell him he was on his way. The package's GPS tracker began moving again soon after the phone call. The package moved from near the front door to inside the garage.

Rucker arrived at Collins's house a short while later. He parked in the driveway, backing up his SUV so that his trunk faced the garage. Rucker's sixteen-year-old companion, N.H., stayed in the car while Rucker entered Collins's garage. Rucker pulled out a radio frequency and

2

GPS detector, used to identify electronic monitoring equipment, and scanned it over the parcel. He then proceeded to open the parcel from the side—which is a trick often used to avoid triggering electronic monitoring equipment—and cut off one of the box's handwritten addresses. He reached inside the box and manipulated the contents.

Rucker did not get very far, however. Law enforcement approached Collins's garage minutes after Rucker arrived and caught Rucker red-handed as he was carrying the box's contents towards his vehicle.

Agents arrested both Collins and Rucker. Officers searched Rucker and found a Taurus snub nose revolver in his pants pocket, three cell phones, and a pocketknife. Officers also searched Rucker's car and found a black backpack on the back seat, which contained 28.34 grams of a mixture that contained 4-ANPP and fentanyl. SA Moses explained that the fentanyl in Rucker's backpack appeared to come off a pressed brick; he believed it was worth around $1,200.

    B.    <u>Even before the November package, Rucker had been receiving and dealing drugs.</u>

This was not the first package Cox sent Rucker—Cox previously sent two packages to Rucker's house in Akron. On August 17, 2023, Cox mailed a package weighing approximately five pounds and nine ounces from Phoenix, Arizona, to Rucker's home address in Akron. Cox sent another package on August 28, 2023, weighing approximately four ounces, from Phoenix to Rucker's house in Akron. The evidence at trial strongly suggested that these packages contained illegal narcotics.

Rucker and Cox got smart, though. On August 31, 2023, Rucker sent Cox a news story about a man who received eleven years in prison for trying to mail two kilograms of cocaine to

3

Mansfield, Ohio.  After that text message, Cox did not send any other packages to Rucker's home in Akron.

Instead, Cox started mailing packages to Collins's house after Rucker gave him the address.  On September 19, 2023, Cox mailed a package weighing five ounces from Chandler, Arizona, to Collins in Cuyahoga Falls.  Ten days later, on September 29, 2023, Cox mailed a package weighing five pounds and fifteen ounces from Phoenix to Collins in Cuyahoga Falls.  That culminated in Cox sending the package in November that resulted in the defendants' arrest.

And the text messages introduced by the government at trial further showed that Rucker had been dealing drugs for months before the November bust.  For instance, Rucker texted with his brother about having "blues" in July 2023.  SA Moses explained that "blues" was code for pills containing drugs.  In September 2023, when asked "what you cut that one stuff with," Rucker replied with a screenshot of Inositol.  SA Moses explained that Inositol is a cutting agent commonly used with drugs like fentanyl, heroin, and cocaine.  And in November 2023, someone asked Rucker if they could "come get a 30 of girl," to which Rucker replied, "Yea."

    C.    <u>A jury convicted Rucker on all counts.</u>

Rucker proceeded to trial on April 22, 2025.  The trial lasted five days.  After a few hours of deliberation, the jury found Rucker guilty on all counts of the indictment.

**II.**    **<u>Applicable legal standards.</u>**

A well-established legal framework guides the Court's sentencing determination.  The advisory Guidelines range serves as "the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also United States v. Collington*, 461 F.3d 805, 807 (6th Cir. 2006).  The Guidelines thus remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.  The Sentencing "Commission fills an

4

important institutional role: It has the capacity courts lack to base its determination on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quotation omitted). After determining the appropriate Guidelines range, the Court then turns to the familiar factors set forth in 18 U.S.C. § 3553(a).

### III. Sentencing Guidelines computation.

The United States agrees with the total offense level as calculated in the PSR.

The base offense level for the grouped Counts 1, 2, 4, and 6 comes from the Drug Quantity Table under U.S.S.G. § 2D1.1(c). The government agrees that the offense involved 4,451.52 grams of Ice, which has a converted drug weight of 89,030.40 kilograms. But, though immaterial given the below conversion, the government disagrees that all the fentanyl involved should be considered a fentanyl analogue. Rather, the United States Attorney's Office's practice is to treat fentanyl mixtures containing 4-ANPP—like the one found in Rucker's backpack—as fentanyl and not a fentanyl analogue, based on the statutory definition contained in 21 U.S.C. § 802(32). This departs from the Guideline definition, but is consistent with the USAO's charging practices and the statutory definition, because the government, in the area of 4-ANPP, is not able to meet the pharmacological prong of the analysis as to this substance. For that reason, the fentanyl from Rucker's backpack should be calculated as if it were fentanyl and not a fentanyl analogue.

While this changes the math slightly, it does not have any impact on Rucker's base offense level. The 28.34 grams of a mixture that contained 4-ANPP and fentanyl converts to 70.85 kilograms of fentanyl. The 1,104.68 grams of a mixture containing 4-ANPP, fentanyl, and fluorofentanyl converts to 11,046.80 kilograms of a fentanyl analogue. Adding the 89,030.40 kilograms grams of Ice, the 70.85 kilograms of fentanyl, and the 11,046.80 kilograms of a

5

fentanyl analogue makes the total converted drug weight 100,148.05 kilograms. While that is roughly 200 kilograms less than the PSR's calculation, it is still more than 90,000 kilograms. Rucker's base offense level would therefore be a 38 regardless. *See* U.S.S.G. § 2D1.1(c)(1).

A two-level enhancement under Section 2D1.1(b)(1) applies because Rucker possessed a dangerous weapon. Specifically, he possessed a loaded Taurus revolver when he retrieved the package from Collins's house.

Another two-level enhancement applies under Section 3B1.4. That section increases a defendant's base offense level if he "used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense." Here, Rucker brought his sixteen-year-old companion with him to pick up the drugs from Collins's house and Rucker also instructed her to get rid of items at his house to avoid detection of further criminal conduct. This two-level enhancement therefore appropriately applies.

After the enhancements, Rucker's total offense level becomes 42. Rucker received two criminal history points. That put him in criminal history category II.

With a total offense level of 42 and a criminal history category of II, Rucker's Guidelines range is 360 months to life imprisonment. Counts 1, 2, and 4 carry a minimum 10 years' imprisonment.

### IV. The 18 U.S.C. § 3553(a) factors weigh in favor of imposing a significant sentence of imprisonment.

The nature and circumstances of Rucker's offense, his history and characteristics, and the need for deterrence all weigh in favor of imposing a lengthy term of imprisonment.

The volume of drugs involved, alone, justifies a harsh sentence. Rucker shipped ten pounds of methamphetamine and 7,000 fentanyl pills into Northeast Ohio. The fentanyl mixtures weighed a little over a kilogram; one kilogram of fentanyl has the potential to kill

6

500,000 people.  *See Facts about Fentanyl*, DEA https://www.dea.gov/resources/facts-about-fentanyl.  Aside from the drugs from the package, Rucker had fentanyl in his backpack in his car that he intended to distribute.  Two milligrams of fentanyl can be potentially lethal; yet Rucker had 28,340 milligrams worth of fentanyl in his backpack alone.

And the fact that Rucker was dating a child, brought her along to the November drug pick up, and enlisted her to hide evidence further shows a long prison term is warranted.  Reports indicated that Rucker and sixteen-year-old N.H. were in a relationship.  (*See* PSR: R. 129, ¶¶ 27, 62).  On a recorded jail call, Rucker praised N.H. for N.H. and Rucker's brother "clearing" out Rucker's house after his arrest.  (*See id.*).  Rucker further instructed N.H. to "[m]ark [Rucker's phones] as lost that way they can't fuck with my shit," meaning so that the police could not find further evidence on Rucker's phone.  These facts weigh towards a hefty term of imprisonment.

Rucker's history and characteristics are not mitigating.  While Rucker grew up in a rough neighborhood, "[t]here was no violence, drug use, or alcohol abuse in [his] childhood home." (*See* PSR ¶ 59).  Rucker's family always had enough food and clothing.  (*Id.*).  He was never physically or sexually abused.  (*Id.*).  Rucker, by all accounts, had a stable upbringing.  He served in the military and was injured in combat.  But since being honorably discharged in 2009, the VA has helped him address his physical and mental health issues.  He also receives Social Security Disability and VA benefits that are generous enough to allow him to maintain a positive monthly cash flow.  Despite these advantages, Rucker still resorted to dealing drugs.

Imposing a lengthy sentence would avoid unwarranted disparities.  The JSIN data shows that of the nine other similarly situated defendants, the average length of imprisonment was 322 months and the median length of imprisonment imposed was 360 months.  A long prison

7

sentence would therefore comport with sentences other defendants have received for similar conduct.

A long sentence would not create disparities between the other defendants in this case. Rather, a significant sentence also would reflect the difference between Rucker's and Cox's history and characteristics. Not only did Rucker receive packages of drugs from Cox, Rucker involved a child in the offense and after his arrest. And Cox, unlike Rucker, accepted responsibility for his conduct. Cox, who qualified for the zero-point offender reduction, timely notified the government of his intent to plead guilty and entered into a plea agreement with the government. Rucker's history and characteristics, his higher degree of culpability, and his refusal to take responsibility for his conduct justifies Rucker receiving a higher sentence than Cox.

Ultimately, the Section 3553(a) factors weigh in favor of imposing a long term of imprisonment.

**V.     Conclusion.**

For the reasons explained above, and those the government will advance at the sentencing hearing, the United States respectfully requests that the Court impose a significant term of imprisonment.

                    Respectfully submitted,

                    DAVID M. TOEPFER
                    United States Attorney

By:   */s/ Stephanie Wojtasik*
       Stephanie Wojtasik (OH: 0097858)
       Assistant United States Attorney
       United States Court House
       801 West Superior Avenue, Suite 400
       Cleveland, OH 44113
       (216) 622-3856
       Stephanie.Wojtasik@usdoj.gov

9

**Certificate of Service**

I hereby certify that on this 10th day of September, 2025, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by regular U.S. Mail to Terrance Rucker, Reg. No. 85802-510, NEOCC, 2240 Hubbard Road, Youngstown, Ohio 44505.

*/s/ Stephanie Wojtasik*
Stephanie Wojtasik
Assistant U.S. Attorney